[Cite as *State v. Guy*, 2018-Ohio-4836.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 17AP-322 |
| v. | : | (C.P.C. No. 16CR-772) |
| James W. Guy, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 6, 2018

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee. **Argued:** *Sheryl L. Prichard.*

**On brief:** *Oglesby & Oglesby Ltd., Attorneys & Counselors at Law*, and *Danielle C. Kulik*, for appellant. **Argued:** *Danielle C. Kulik.*

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, James W. Guy ("James"), appeals from a judgment of the Franklin County Court of Common Pleas sentencing him to a total of 20 years imprisonment pursuant to jury verdicts finding him guilty of two counts of heroin trafficking, one count of heroin possession, and one count of kidnapping. For the reasons that follow, we affirm.

I. Facts and Procedural History

{¶ 2} James, his brother, Isaiah Guy ("Isaiah"), and Andrew Naus ("Naus") were indicted in February 2016 on various drug possession, drug trafficking, and kidnapping charges related to events that occurred in October 2014. The charges against James were

initially tried in May 2016 and resulted in a hung jury. A second jury trial was conducted against both James and Isaiah in late February and early March 2017.

{¶ 3} Prior to the first trial, at a hearing conducted on January 20, 2016, James's appointed counsel advised the court that the prosecution had offered James a plea agreement. James's counsel told the judge he had advised James to accept the offer based on the potential penalties he faced if convicted on all charges in the indictment. James's counsel expressed the view that it was in James's best interest to accept the plea agreement, but informed the court that James had declined to plead guilty and wished to go to trial. James's counsel also advised the court that James had filed two complaints against him with the Columbus Bar Association, but noted the complaints had been dismissed at the intake phase. Counsel indicated he did not believe he had a conflict of interest due to the complaints and stated he thought he worked well with James when they met to discuss the plea offer. At that time, James indicated to the judge that he wished to continue working with his counsel to establish a better relationship.

{¶ 4} At a subsequent hearing on February 6, 2017 when the second trial was set to commence, James requested a continuance based on the discovery of a new witness. James also indicated at the hearing that he had difficulty communicating with his counsel and indicated he wished to represent himself at trial. James alleged that his counsel did not plan to call any of his alibi witnesses. James's counsel indicated his belief that the alibi put forward in the first trial was no longer credible because of information received after that trial and he would not put on an alibi that he did not believe had a good-faith basis. James's counsel told the court plaintiff-appellee, State of Ohio, had offered another plea agreement that was more favorable in terms of the potential penalties, and he had advised James to accept it. James's counsel asserted he had repeatedly tried to contact James in the preceding weeks but had received no response. The court granted a brief continuance and advised James to consider whether he wished to proceed pro se. James ultimately elected to proceed pro se and the court retained James's appointed counsel as advisory counsel to assist James with any questions he had during trial.

{¶ 5} An undercover detective from the Special Investigations Unit of the Franklin County Sheriff's Office ("the detective") testified at the second trial that he received information from a confidential informant about narcotics activity at an address on West

Broad Street in Columbus, Ohio. Although the detective did not find evidence of narcotics activity at that location, the investigation led him to investigate narcotics activity at 72 South Wheatland Avenue ("72 South Wheatland") in Columbus, Ohio. The informant arranged for the detective to purchase heroin at that address from an individual identified as "Zay." On October 15, 2014, the detective and the informant went to 72 South Wheatland and the detective purchased one gram of heroin from "Zay." During the transaction, "Zay" questioned the detective about his car and suggested the detective could be a police officer. The detective lifted his shirt to indicate he was not wearing any recording devices. Following the purchase, the detective researched the information he knew about "Zay," including the initial address provided by the confidential informant, and identified Isaiah as "Zay." At trial, the detective identified Isaiah in the courtroom as the individual referred to as "Zay," who sold heroin to him.

{¶ 6} On October 16, 2014, the detective called Isaiah to arrange a second purchase of heroin. The detective returned to 72 South Wheatland with another undercover detective and purchased two grams of heroin from Isaiah. The detective entered the house alone, while the other detective waited in the car. The detective was not wearing a recording device but had a cell phone in his pocket that was connected to an open line being monitored by a surveillance team. In addition to Isaiah, another individual was present at the house and Isaiah introduced him to the detective as his "brother Stone." (Tr. Vol. II at 344.) Following the transaction, the detective conducted research and retrieved photographs; this research led him to identify James as the individual who was introduced to him as "brother Stone." The detective testified that surveillance of the residence identified a partial Illinois license plate number on one of the vehicles parked outside the residence. The detective determined the number was a partial match to a license plate number registered to James. At trial, the detective identified James in the courtroom as the individual who was introduced as "brother Stone."

{¶ 7} During the transaction on October 16, 2014, James questioned the detective about his car and whether he intended to use or sell the heroin. James then said something about the detective being a police officer and asked whether he was wearing a recording device. When James attempted to pat him down, the detective pushed James away and refused to be searched. James then told the detective to wait and turned toward a curtain

leading into the next room. The detective turned toward the exit door, which had been resting against the door jamb but not fully closed. Isaiah then stepped between the detective and the door, and closed the door. The detective turned back toward the interior of the room and found James holding a black pistol in his face. At trial, the detective identified the gun James pointed at him as appearing similar to a Springfield .40 caliber pistol that was recovered from the house in a search the following day. James told the detective to step away from the door and the detective complied. James instructed the detective to remove his clothes. The detective refused to undress but removed his coat and James instructed Isaiah to pat him down. During the search, the detective admitted he had a firearm, which Isaiah removed from his pocket and placed in the corner of the room. The detective claimed he had the gun to avoid being robbed. James then put his gun in his waistband and continued the transaction. After completing the purchase, the detective asked for his gun back. James pulled out his own gun and pointed it at the detective while telling him to go get the gun but keep it pointed down. The detective then retrieved his gun and left the residence. The detective testified that the lighting inside 72 South Wheatland was minimal, but adequate, and that he was approximately three to eight feet away from Isaiah and James during the transaction.

{¶ 8} On October 17, 2014, the detective and a Special Weapons and Tactics ("SWAT") team executed a search warrant on 72 South Wheatland. Both Isaiah and James were present at the time the search warrant was executed and were both arrested. James's state identification card was found on a table in the living room at 72 South Wheatland when the search warrant was executed, although the detective admitted that it could have been removed from James's pocket and placed on the table when he was searched. During the initial entry, a dog that was present on the property was killed by a SWAT officer.

{¶ 9} At the second trial, the state presented recordings of telephone calls made by Isaiah while in the Franklin County Jail. In one of the calls, Isaiah identified himself as "Zay" at the recorded introduction of the call before then saying "Isaiah." Isaiah asked the recipient of the call how he was identified at the beginning of the call. When the call recipient responded "Zay, Isaiah," Isaiah indicated he made a mistake by referring to himself as "Zay" and tried to correct it. In another call, placed by Isaiah to James on October 23, 2014 after James had been released from the Franklin County Jail, James

indicated he had posted on Facebook about the incident.  The detective testified that based on this call and using a telephone number he had for Isaiah, he identified a Facebook page belonging to Isaiah under the name "Zay Block."  This page contained 6 to 12 photographs of Isaiah.  The detective testified the "Zay Block" page was also linked to a Facebook page for James under the name "Wes Worlds."  The detective testified that this Facebook page contained dozens of photographs of James.  On the "Wes Worlds" Facebook page there were posts on October 23, 2014 asserting that SWAT officers had killed the page owner's dog during a raid, and warning that undercover and SWAT officers were actively pursuing drug dealers.

{¶ 10}  The prosecution also presented recordings of telephone calls made by James while in the Franklin County Jail.  In one of the calls, James referred to himself as being a "Black Stone."  (Tr. Vol. III at 556.)  During the call, James also referred to the Black Stone organization as being affiliated with the Muslim religion.  The detective testified that "Black P. Stone" is a criminal gang based in Chicago, Illinois and Los Angeles, California. He testified that it would not be uncommon for gang members to refer to each other by the generic term "Stone."  On cross-examination, the detective admitted that jail inmates sometimes switch personal identification numbers for use in making phone calls. The pre-recorded message containing the caller's name is associated with the personal identification number; therefore, this information would not change if one inmate used another inmate's personal identification number to make a call.

{¶ 11}  On cross-examination, the detective admitted that none of the items retrieved from 72 South Wheatland pursuant to the search warrant were submitted for fingerprint or DNA testing.  The detective also admitted there were no surveillance photographs of Isaiah at that location on October 15th or 16th.  The detective admitted on cross-examination that he did not see Isaiah possess a firearm during either transaction, except when he removed the detective's own firearm from his pocket and placed it in the corner.

{¶ 12}  James and Isaiah's mother, Patricia Guy ("Patricia"), was called as a witness and testified she did not recall seeing Isaiah on October 15, 2014, but saw him during the afternoon of October 16th at a casual family gathering at her daughter's house on Livingston Avenue.  Patricia testified Isaiah was living at that address at the time.  Patricia testified she

was at the gathering for a few hours, but did not know if Isaiah was present that entire time. Patricia did not specifically testify that James was at the gathering.

{¶ 13} James's fiancée, Debra Smith ("Smith"), testified that James and his five brothers have a similar physical appearance. Smith testified she spent part of October 16, 2014 with James at his mother's house and another part of the day and evening with James and members of his family at his sister's house. On cross-examination, Smith testified that she and James drove around in a maroon or purplish Envoy on October 16, 2014. The Special Investigations Unit surveillance log for October 16, 2014 indicated a maroon Envoy was one of the vehicles present behind 72 South Wheatland on that date. Smith also admitted on cross-examination that she did not contact police to state that James was with her on October 16, 2014 prior to trial, but also testified that she was not contacted by law enforcement about the events of October 16th or 17th. She also testified she did not believe she needed to come forward because she and James believed there was a police recording of the events on October 16th that would exonerate James.

{¶ 14} James and Isaiah's brother, Daniel Guy ("Daniel"), testified he has frequently been mistaken for his brothers, including one time when he was subjected to a traffic stop while driving a white truck registered to James, and searched because police officers believed one of his brothers was in the vehicle. Daniel testified that he and Naus performed improvements on the house at 72 South Wheatland, getting it ready for Naus to occupy it. Daniel testified there were "[a] lot of people" in the house at 72 South Wheatland throughout the day. (Tr. Vol. VII at 1431.)

{¶ 15} At the close of the jury trial, James was convicted on two counts of heroin trafficking and each of the firearm specifications associated with those charges, one count of heroin possession, and one count of kidnapping and the firearm specification associated with that charge. The trial court found that the heroin trafficking and possession charges related to October 17, 2014, merged for purposes of sentencing, and sentenced James to a total of 20 years imprisonment on all charges.

## II. Assignments of error

{¶ 16} James appeals and assigns the following nine assignments of error:

> I. THE TRIAL COURT ERRED IN ALLOWING INEFFECTIVE ASSISTANCE OF COUNSEL WHEN

COUNSEL PROFESSES A DISBELIEF IN THEIR CLIENT'S INNOCENCE.

II. A VERDICT CANNOT BE SUSTAINED WHEN THERE WERE EVIDENTIARY AND FACTUAL INACCURACIES WITH THE IDENTIFICATION OF THE DEFENDANT.

III. A TRIAL COURT ERRS IN ALLOWING A JUROR TO REMAIN WHEN THAT JUROR IS BIASED AND AN OBJECTION IS MADE TO THEIR REMAINING.

IV. A TRIAL COURT ERRS IN ALLOWING HEARSAY WHEN THE TRUE EVIDENCE IS KEPT FROM THE COURT AND THE DEFENSE UNDER THE GUISE OF TECHNICAL MALFUNCTION.

V. A TRIAL COURT ERRS IN ALLOWING THE INTRODUCTION OF EVIDENCE PERTAINING TO THE DEFENDANT'S RELIGION WHEN THE PROBATIVE VALUE IS LESS THAN THE PREJUDICIAL EFFECT.

VI. A TRIAL COURT ERRS IN ALLOWING JAIL CALLS AND IDENTIFICATION OF THE SPEAKER CONTRARY TO THE RULES OF EVIDENCE.

VII. THE RULE 29 MOTION FOR ACQUITTAL WAS IMPROPERLY DENIED AND THUS THE DEFENDANT WAS NOT AFFORDED THE PROPER DIRECTED VERDICT.

VIII. THERE NEEDS TO BE A RESENTENCING WHEN THE LAW AND THE FACTORS OF FELONY SENTENCING ARE INCONSISTENT WITH THE SENTENCE IMPOSED.

IX. THE MOTION FOR A NEW TRIAL SHOULD HAVE BEEN GRANTED.

## III. Analysis

### A. Ineffective assistance of counsel

{¶ 17} In his first assignment of error, James asserts he received ineffective assistance of counsel from his appointed counsel. He claims counsel violated his duties by failing to advocate for him and by professing his guilt to the court. James further claims his counsel had a conflict of interest because he did not believe James, and that his counsel

failed to provide proper assistance prior to trial and when acting as advisory counsel during trial.

{¶ 18} We apply a two-part test to evaluate claims of ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland* at 687. "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley* at paragraph three of the syllabus.

{¶ 19} In support of his argument that counsel performed deficiently, James cites a Fourth District Court of Appeals decision holding that a criminal defense attorney violated his duty to his client by stating during closing argument that he did not believe his own client and expected the jury to find him guilty. *State v. Burgins*, 44 Ohio App.3d 158, 160 (4th Dist.1988). James argues his counsel similarly expressed a belief that James was guilty, referring to statements made during pre-trial hearings. However, counsel's statements in this case are clearly distinguishable from the attorney's conduct in *Burgins*. During the January 20, 2016 and February 6, 2017 pre-trial hearings, James's counsel did not express any opinion on James's guilt or innocence. Rather, he notified the trial judge he had advised James to accept a plea agreement because of the substantial difference in potential prison time under the plea agreement and the potential prison term if James was convicted on all charges. Unlike *Burgins*, these statements were not made before the jury, but only in pre-trial hearings before the trial judge. Moreover, advising a client to accept a plea agreement that reduces charges and potential penalties generally does not constitute ineffective assistance of counsel. *See, e.g., State v. McMichael*, 10th Dist. No. 11AP-1042, 2012-Ohio-3166, ¶ 31 ("Defendant faced 13 charges in the three consolidated cases, so counsel's advising him to accept a plea bargain that dismissed nine of those charges instead of risking trial easily falls within 'the wide range of professionally competent assistance' recognized under *Strickland. Id.* at 690."). James's counsel did not perform deficiently by advising James to accept a plea agreement or by notifying the trial judge of that advice.

{¶ 20} James also asserts his counsel "testified" that his alibi was not credible. (Appellant's Brief at 6.) At the February 6, 2017 pre-trial hearing, James's counsel indicated to the judge that he believed certain alibi testimony that had been offered in the first trial was no longer credible based on subsequent information. These comments did not constitute testimony and they were not made in front of the jury. Moreover, because James acted as his own trial counsel he was able to put on any alibi witnesses he chose, irrespective of any concerns his counsel may have held. Thus, even if this statement constituted deficient performance, James cannot establish that he was prejudiced by it.

{¶ 21} There is also no evidence in the record that counsel performed deficiently while acting as James's advisory counsel. Instead, the trial transcript is replete with examples of counsel providing assistance in the organization of James's presentation and attempting to help James understand the court's rulings. Based on our review of the record, we cannot conclude that counsel performed deficiently while acting as advisory counsel and, therefore, need not consider the second step of the two-part test for ineffective assistance of counsel.

{¶ 22} Accordingly, we overrule James's first assignment of error.

## B. Consideration of potentially-biased juror

{¶ 23} In his third assignment of error, James asserts he was deprived of a fair trial with an impartial jury because the judge retained a juror whom James alleges was potentially biased. James argues the juror in question had two potential bases for bias and the trial judge only examined her about one. At the beginning of voir dire, the judge recognized the juror and noted the juror was "my very good friend's mother-in-law, the grandmother of her children." (Tr. Vol. I at 51-52.) The judge asked the juror whether she could be an impartial juror in the case given her personal knowledge of the judge. The juror responded that she was fine. The following day, during a conference in chambers, the court informed the parties that this same juror's son was best friends with an undercover police officer who had been convicted and imprisoned based on actions he took in his official capacity. The judge noted that the juror indicated on her jury questionnaire that she did not have close friends or relatives who were police officers, and that the judge did not know what, if any, personal relationship the juror had with the convicted officer. James's counsel also indicated during the conference that he had represented the convicted officer. During

this conference, none of the parties indicated they had concerns with the juror remaining on the panel and trial resumed.

{¶ 24} The following day, in a conference held outside the presence of the jury, James requested the juror be removed from the jury and replaced with an alternate juror. The judge indicated the juror had already been questioned about whether her personal familiarity with the judge would affect the juror's ability to be impartial. With respect to the potential conflict arising from the juror's son's relationship with the convicted undercover police officer, the judge noted the juror did not raise her hand when the prosecutor asked during voir dire whether any potential juror had a relative or friend that was a police officer. Likewise, the juror answered no on the jury questionnaire question that asked whether she had a friend or relationship with a police officer. The trial judge further noted that James had not objected the day before when the issue had initially been raised. In light of those circumstances, the judge indicated she would not remove the juror at that point in the trial.

{¶ 25} On appeal, James acknowledges he failed to object when the issue related to the convicted undercover police officer was initially raised and that the trial court's decision to retain the juror at that time is subject to plain error review. Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error exists when there is an obvious defect in the trial proceedings that affects substantial rights. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). A court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. We note that James subsequently raised the issue before the trial was complete. The trial court's decision not to remove the juror due to bias once James objected is subject to abuse of discretion review. An abuse of discretion occurs when a decision is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 26} Crim.R. 24(C)(9) provides that a juror may be challenged for cause when she is "possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that the juror will

render an impartial verdict according to the law and the evidence submitted to the jury at the trial." In this case, the juror's potential bias arose not from her own personal relationship, but rather from her son's friendship with a convicted former undercover police officer. The trial judge did not question the juror directly about any potential bias arising from this relationship, but considered the other evidence available, including the juror's answers to the jury questionnaire and during voir dire. The judge made the parties aware of the issue out of an abundance of caution, and we cannot conclude she committed plain error by failing to remove the juror when none of the parties initially objected. Likewise, we cannot conclude the judge abused her discretion by refusing to remove the juror when James subsequently objected, because she considered the evidence available and was satisfied that there was no indication the issue would affect the juror's impartiality.

{¶ 27} Accordingly, we overrule appellant's third assignment of error.

## C. Evidentiary issues

{¶ 28} In his fourth, fifth, and sixth assignments of error, James argues the trial court erred by admitting certain evidence. Because these assignments of error all involve evidentiary issues, we will consider them together.

{¶ 29} The trial court has broad discretion over the admission of evidence and a reviewing court generally will not reverse an evidentiary ruling absent an abuse of discretion. *State v. Darazim*, 10th Dist. No. 14AP-203, 2014-Ohio-5304, ¶ 16. As noted above, an abuse of discretion occurs when a court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore* at 219.

{¶ 30} James asserts in his fourth assignment of error the trial court erred by allowing the detective to testify about the transaction on October 16, 2014. James argues the detective should not have been allowed to testify because no recording of the transaction was provided despite there being references to the use of a "wire" during the undercover operation and in the surveillance log. James appears to argue the state was required to rely on an audio recording of the transaction made using this wire, rather than relying on the detective's testimony about the incident. This argument appears to be based on a misunderstanding of the evidence. The surveillance logs for October 15th and 16th refer to the use of a "wire." The detective testified that the term "wire" was used generally to refer to a listening device that allowed the surveillance team to monitor an undercover

transaction.  The term did not necessarily mean a listening device that would make an audio recording of the transaction.  The detective testified that on October 16th the reference to a wire meant the cell phone he was carrying, which was connected to an open line monitored by the surveillance team.  The detective testified the department's recording devices were inoperable at the time of the transactions.  Other officers involved in the undercover operation testified similarly that the recording devices were inoperable at the time and that the "wire" consisted of the detective's cell phone, which was being monitored by the surveillance team.  Because there is no indication any recording of the undercover transactions existed, there was no abuse of discretion in permitting the detective to testify about those transactions.

{¶ 31}  In his fifth assignment of error, James asserts the trial court erred by allowing the state to introduce evidence of his religious affiliation.  James argues any probative value of this evidence was substantially outweighed by the risk of undue prejudice.

{¶ 32}  Under the Ohio Rules of Evidence, relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Evid.R. 401.  Relevant evidence is generally admissible, except where otherwise provided by the constitution, statutes, or rules.  Evid.R. 402.  Evid.R. 403(A) provides that relevant evidence is not admissible if the probative value of that evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

{¶ 33}  Exclusion of relevant evidence based on undue prejudice requires more than mere prejudice, because anything adverse to a party's case could be deemed prejudicial to that party.  *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 8.  " 'Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision.  Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial.' "  *Id.* at ¶ 24, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001).

{¶ 34}  In one of the jail call recordings played for the jury, James explained he did not eat pork because he practiced the religion of Islam, and further explained he became a Muslim based on his affiliation with the Black P. Stone organization.  The detective testified

that Black P. Stone is a criminal gang based in Chicago, Illinois and Los Angeles, California. He testified it would not be uncommon for gang members to refer to each other by the generic term "Stone," and that members of other gangs such as the Bloods and the Crips used similar generic nicknames when greeting each other. James argues references to him being a Muslim and being part of a criminal gang created a risk of unfair prejudice that outweighed the probative value of this evidence.

{¶ 35} As discussed further below, the issue of identity was a key element of James's defense. The detective testified that during the October 16th transaction, "Zay" introduced the second individual present as his "brother Stone." Thus, evidence linking James to the Black P. Stone organization and establishing that members of the organization might be referred to generically as "Stone" was relevant to establishing that James was the individual introduced to the detective as "brother Stone." Although the explanation that the Black P. Stone organization was affiliated with the religion of Islam was not directly relevant to establishing James's identity, in the context of the particular recording it would have been very difficult to redact James's references to his religion because they were interwoven within the discussion of the organization. The few passing references to James's religious affiliation were not the type of evidence that would evoke a sense of horror or appeal to the jury's instinct to punish. Therefore, the trial court did not abuse its discretion by allowing the state to introduce these portions of the jail call recording.

{¶ 36} James argues in his sixth assignment of error the trial court abused its discretion by admitting the jail call recordings because the there was no testimony to authenticate that it was James's voice on the calls. James asserts the detective did not testify he recognized James's voice and no other foundation was laid to establish a reasonable likelihood that the calls were made by James.

{¶ 37} Evid.R. 901(A) provides that the requirement of authentication is satisfied by evidence sufficient to support a finding that the matter is what the proponent claims it to be. The rules provide several illustrations of authentication conforming to those requirements. This court has held that multiple methods exist for authenticating a telephone conversation in a criminal case. *State v. Small*, 10th Dist. No. 06AP-1110, 2007-Ohio-6771, ¶ 38. Evid.R. 901(B)(5) provides that "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based

upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Evid.R. 901(B)(4) provides that "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with [the] circumstances" may also be sufficient to authenticate evidence. Under this method, "the contents of the conversation, the characteristics of the speech itself, or the circumstances of the call, must render it improbable that the caller could be anyone other than the person the proponent claims him to be." *Id.* at ¶ 39.

{¶ 38} In the present case, the detective testified he listened to the call excerpts before they were introduced at trial. The detective had also heard James's voice during the heroin transaction on October 16th. The state introduced evidence establishing the calls were associated with James's personal identification number, assigned while he was in the Franklin County Jail. In addition to the statements about the Black P. Stone organization, in other calls purportedly made by James, the caller discussed the complicity charges contained in the indictment and the SWAT officers killing the caller's dog. The state presented evidence of a Facebook page associated with James containing posts asserting his dog had been killed by SWAT officers. Similar to *Small*, we conclude that under the circumstances in this case, the call recordings contained sufficient evidence to identify James as the caller. Although the detective testified on cross-examination that county jail inmates sometimes exchanged personal identification numbers to obscure their calls, it is unlikely another inmate who was affiliated with the Black P. Stone organization and had a dog killed by SWAT officers in a raid would have been incarcerated at the same time and exchanged personal identification numbers with James. *See Small* at ¶ 41. Moreover, we note that because James acted as his own counsel at trial, the jury had ample opportunity to hear his voice throughout the trial and could consider this when evaluating whether it was James's voice on the call recordings. Under these circumstances, the trial court did not abuse its discretion by admitting the recordings of the jail calls.

{¶ 39} Accordingly, we overrule James's fourth, fifth, and sixth assignments of error.

**D. Sufficiency of the evidence**

{¶ 40} In his seventh assignment of error, James asserts the trial court erred by denying his Crim.R. 29 motion for acquittal. Because a Crim.R. 29 motion questions the sufficiency of the evidence, we apply the same standard of review on appeal as in a challenge

to the sufficiency of the evidence. *State v. Kearns*, 10th Dist. No. 15AP-244, 2016-Ohio-5941, ¶ 44. "Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Where the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt," it is sufficient to sustain a conviction. *Id.* "The testimony of a single witness, if believed by the finder of fact, is sufficient to support a criminal conviction." *State v. Booker*, 10th Dist. No. 15AP-42, 2015-Ohio-5118, ¶ 18. *See also State v. Conkel*, 10th Dist. No. 08AP-845, 2009-Ohio-2852, ¶ 14, citing *State v. Ruhlman*, 12th Dist. No. CA2005-05-125, 2006-Ohio-2137, ¶ 26 (for the proposition that the testimony of a victim as to the elements of sexual assault, if believed, is sufficient to establish the elements of the offense).

{¶ 41} James argues the state failed to establish the detective was kidnapped during the transaction on October 16th. The statute defining the offense of kidnapping provides, in relevant part, that no person shall restrain the liberty of another person for the purpose of facilitating the commission of any felony or flight thereafter. R.C. 2905.01(A)(2). The detective testified that during the transaction on October 16th, James suggested the detective might be a police officer and attempted to pat him down. When the detective refused to be searched and stepped toward the door, Isaiah blocked his exit. James then pointed a gun at the detective and told him to step away from the door. After the detective admitted to having a gun, which he surrendered to James, the situation deescalated and the transaction was completed. This evidence, viewed in the light most favorable to the prosecution, is sufficient to establish that James restrained the detective's liberty for the purpose of ensuring he was not a police officer, which facilitated the commission of the felony crime of heroin trafficking.

{¶ 42} With respect to the heroin trafficking and possession charges, James argues there was no evidence that he sold heroin or prepared heroin for sale and no evidence that

he possessed heroin. James claims the only evidence was that the individual identified as "Zay" possessed and sold drugs.

{¶ 43} Under the principle of complicity, an individual may be found guilty if he solicits, aids, abets, or conspires with another individual to commit an offense and shares the criminal intent of the individual who commits the principal offense. *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus; *State v. Moore*, 10th Dist. No. 10AP-10, 2010-Ohio-4322, ¶ 17. An accomplice's intent may be inferred from the circumstances surrounding the crime. *Johnson* at syllabus. A charge of complicity may be stated in terms of R.C. 2923.03 or in terms of the principal offense, and a defendant charged with an offense may be convicted of that offense upon proof he was complicit in its commission even if the indictment against the defendant is stated in terms of the principal offense. *State v. Horton*, 10th Dist. No. 13AP-855, 2014-Ohio-2785, ¶ 8.

{¶ 44} The statute prohibiting drug trafficking provides that no person shall knowingly sell or offer to sell a controlled substance or prepare a controlled substance for shipment, transport, or distribution. R.C. 2925.03(A). The statute prohibiting drug possession provides that no person shall knowingly obtain, possess, or use a controlled substance. R.C. 2925.11(A). The detective testified Isaiah sold him heroin on October 16th, and there was evidence presented to establish that the material sold to the detective on that date was heroin. As noted above, the detective testified James was present during the transaction and the evidence was sufficient to establish that James aided and abetted the transaction by attempting to ensure the detective was not a police officer. With respect to the heroin possession and trafficking charges arising from the evidence obtained pursuant to the search warrant on October 17th, there was evidence that heroin and packaging paraphernalia were recovered from 72 South Wheatland. The detective testified that James had been at 72 South Wheatland on October 16th and was present on October 17th when the search warrant was executed. The presence of items commonly used in drug trafficking may constitute circumstantial evidence of drug trafficking. *State v. Saunders*, 10th Dist. No. 13AP-668, 2014-Ohio-1746, ¶ 20. Similarly, circumstantial evidence may be sufficient to support a finding of constructive possession of drugs. *State v. Hurse*, 10th Dist. No. 14AP-687, 2015-Ohio-2656, ¶ 21. Viewing the evidence presented at trial in the light most

favorable to the prosecution, a rational juror could find that all the essential elements of drug possession and trafficking had been proven beyond a reasonable doubt.

{¶ 45} Accordingly, we overrule James's seventh assignment of error.

## E. Weight of the evidence

{¶ 46} In his second assignment of error, James argues the convictions were against the manifest weight of the evidence because the prosecution failed to prove beyond a reasonable doubt that he was the individual who committed the offenses.

{¶ 47} James first argues there were procedural errors in the detective's identification of James's photograph and in the lack of fingerprint or DNA testing of the evidence. The detective testified that after the transaction on October 16th, he used an online database to attempt to determine the identity of the individual identified as "brother Stone." This included identifying individuals associated with Isaiah, including "James Wesley Guy" who also had a possible alias of "James Stone." The detective also obtained multiple photographs of James and identified him as the individual who had been introduced to him as "brother Stone." Despite James's assertions, there is no indication this process was unduly suggestive. Similarly, although James argues that fingerprint or DNA testing might have been exculpatory, there is no indication in the record that James requested such testing be performed and no procedural error arises from the state declining to independently undertake such testing.

{¶ 48} James further argues the jury verdicts were against the manifest weight of the evidence, asserting his alibi witnesses were more credible than the detective and the state's evidence. "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25.

> When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161, ¶ 12, citing *Thompkins* at 387. This authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). In conducting our review of the evidence, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 49} The detective identified James in the courtroom as the individual introduced to him as "brother Stone" during the October 16th transaction. He testified the lighting inside 72 South Wheatland where the transaction occurred was low, but adequate for him to see James. The detective further testified that after the initial transaction on October 16th, he conducted research and identified a "Wes Worlds" Facebook page, containing multiple photographs of James that was linked to a "Zay Block" Facebook page associated with Isaiah. This Facebook page contained posts referring to the killing of the page owner's dog in a SWAT raid. The detective also testified that James was present on October 17th when the search warrant was executed. As explained above, this testimony alone, if believed by the jury, would have been sufficient to establish the element of identity. *Booker* at ¶ 18. However, the prosecution did not rely solely on the detective's testimony to establish that James was the individual identified as "brother Stone." The prosecution introduced the jail call recordings in which James discussed his membership in the "Black Stone" organization and evidence that it would not be uncommon for a member of that organization to be referred to generally as "Stone." There were also excerpts from jail calls where James referred to the killing of his dog by SWAT officers.

{¶ 50} James relies on testimony from Daniel and Smith asserting that all the Guy brothers have a similar appearance and resemble each other. James also relies on the testimony from Smith that she was with James on October 16th. However, Smith testified they drove around in a maroon Envoy and the surveillance log indicates a vehicle of that type and color was present at 72 South Wheatland on October 16th. Smith also admitted on cross-examination she did not come forward to police with her claim that James was

with her on October 16th.  Moreover, Smith had a personal relationship with James, and the jury was able to consider that in weighing her credibility.  *See State v. Powell*, 10th Dist. No. 17AP-808, 2018-Ohio-3944, ¶ 15 ("As the finder of fact, the jury is in the best position to weigh the credibility of testimony by assessing the demeanor of witnesses and the manner in which they testify, their connection or relationship with the parties, and their interest, if any, in the outcome.").

{¶ 51} Based on our review of the evidence, and all reasonable inferences, and considering the credibility of the witnesses, we cannot find that this was a situation where the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed.

{¶ 52} Accordingly, we overrule James's second assignment of error.

## F.  Sentencing

{¶ 53} In his eighth assignment of error, James challenges the sentences imposed by the trial court.  James argues the trial court erred by imposing a maximum sentence on the conviction for kidnapping and by imposing consecutive sentences for all convictions. James further appears to argue the trial court failed to properly consider the sentencing factors and guidelines, asserting there were no aggravating factors present and the trial court failed to consider certain mitigating factors.

{¶ 54} "An appellate court will not reverse a trial court's sentencing decision unless the evidence is clear and convincing that either the record does not support the sentence or that the sentence is contrary to law."  *State v. Robinson*, 10th Dist. No. 15AP-910, 2016-Ohio-4638, ¶ 7.  Thus, "we look to the record to determine whether the sentencing court considered and properly applied the statutory guidelines and whether the sentence is otherwise contrary to law."  *State v. Reeves*, 10th Dist. No. 14AP-856, 2015-Ohio-3251, ¶ 4.

{¶ 55} We begin with James's claim that the trial court erred by imposing consecutive sentences.  He argues the record does not support the court's finding that consecutive sentences were necessary to protect the public or punish James.

{¶ 56} "Under Ohio law, absent an order requiring sentences to be served consecutively, terms of incarceration are to be served concurrently."  *State v. Sergent*, 148 Ohio St.3d 94, 2016-Ohio-2696, ¶ 16, citing R.C. 2929.41(A). A trial court may, in its discretion, impose consecutive sentences for multiple prison terms pursuant to R.C.

2929.14(C)(4). *Id.* To impose consecutive sentences, the trial court must find that: (1) the consecutive sentence is necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) at least one of the following:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4).

{¶ 57} The Supreme Court of Ohio has held that "[i]n order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, syllabus. A trial court is not required to provide a "talismanic incantation of the words of the statute" in making such findings. *Id.* at ¶ 37. Accordingly, appellate courts have been "fairly deferential to the trial court" in reviewing R.C. 2929.14(C)(4) challenges and will determine the trial court made requisite findings if reasonably able to discern such findings from the record. *See id.* at ¶ 29 (instructing that "as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld"). "In determining whether the trial court engaged in the correct analysis, an appellate court 'may liberally review the entirety of the sentencing transcript to discern whether the trial court made the requisite findings.' " *State v.*

*Hairston*, 10th Dist. No. 17AP-416, 2017-Ohio-8719, ¶ 8, quoting *State v. Stephen*, 7th Dist. No. 14 BE 0037, 2016-Ohio-4803, ¶ 22.

{¶ 58} At the sentencing hearing, the court discussed the presentence investigation with James and the prosecutor. The prosecutor asserted that James had prior convictions involving guns and had threatened the detective with a gun in this case, which elevated the seriousness of the offense. The prosecutor further asserted that James refused to take responsibility for his actions and blamed the system. James admitted he had been convicted of unlawful possession of a firearm in Illinois but asserted the convictions stemmed from the discovery of a loaded shotgun under a couch at his mother's residence. James claimed the weapon was not his and that he unsuccessfully tried to fight the charges. James admitted he blamed the system and asserted he had not received a fair process and a fair trial. The trial court noted that James refused to cooperate in the presentence investigation and provide any mitigating information beyond blaming the system. The court also noted that although James questioned the detective and other officers about the death of his dog and potential harm to his young son during the SWAT raid, he failed to acknowledge he was responsible for his dog and child being present at a location where drugs and weapons were found. The trial court noted the risk of harm to the detective created when James held him at gunpoint. The court stated that James was "being given a consecutive sentence because the Court finds that a consecutive sentence is necessary to protect the public from future crimes and to punish the offender." (Mar. 23, 2017 Tr. at 31.) The court further made the following findings:

> Consecutive sentences are not disproportionate to the seriousness of the offender's conduct and the danger the offender poses to the public. And the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crimes by the offender.

(Mar. 23, 2017 Tr. at 31.) Thus, the trial court made all the findings required by R.C. 2929.14(C)(4) in support of consecutive sentences.

{¶ 59} "[O]nce the trial court makes the factual findings required by R.C. 2929.14(C)(4), an appellate court may overturn the imposition of consecutive sentences only if it finds, clearly and convincingly, that the record does not support the sentencing court's findings or that the sentence is otherwise contrary to law." *State v. Hargrove*, 10th

Dist. No. 15AP-102, 2015-Ohio-3125, ¶ 22. In this case, the trial court considered James's prior record based on the presentence investigation and the seriousness of the conduct involved in this case, where a drug transaction escalated to armed kidnapping when he held the detective at gunpoint. Under these circumstances, we cannot conclude that the record clearly and convincingly fails to support the trial court's findings underlying the imposition of consecutive sentences. *See id.* at ¶ 24.

{¶ 60} With respect to the trial court's imposition of the maximum sentence on the kidnapping conviction, James argues there was no evidence he committed the worst form of the offense. Similarly, he asserts the trial court did not properly consider the purposes and principles of sentencing under R.C. 2921.11 and the sentencing factors under R.C. 2929.12.

{¶ 61} A trial court has broad discretion to determine the most effective way to comply with the purposes and principles of sentencing under the statutory guidelines and is not required to make any specific finding in support of the imposition of a maximum sentence. *State v. Frederick*, 10th Dist. No. 13AP-630, 2014-Ohio-1960, ¶ 15. At the sentencing hearing, the trial court referred to the risk of harm to the detective created by James's use of a firearm in attempting to search him and determine whether he was a police officer, which supported its finding that it was the worst form of the offense. The court also stated in the sentencing entry that it had considered the purposes and principles set forth in R.C. 2929.11 and the factors set forth in R.C. 2929.12. Based on our review of the record and his arguments, James has not clearly and convincingly shown that imposition of a maximum sentence for the kidnapping conviction was contrary to law.

{¶ 62} Accordingly, we overrule James's eighth assignment of error.

**G. Motion for new trial**

{¶ 63} Finally, James argues in his ninth assignment of error the trial court abused its discretion by denying his motion for new trial.

{¶ 64} "A motion for new trial pursuant to Crim.R. 33(B) is addressed to the sound discretion of the court, and will not be disturbed on appeal absent an abuse of discretion."

*State v. Schiebel*, 55 Ohio St.3d 71 (1990), paragraph one of the syllabus.[1]  A motion for new trial for any reason except newly discovered evidence must be filed within 14 days after the verdict was rendered unless the defendant can establish by clear and convincing proof that he was unavoidably prevented from filing his motion within that time.  Crim.R. 33(B).

{¶ 65}  James did not assert there was newly discovered evidence in his motion for new trial; therefore, it was required to be filed within 14 days after the verdicts were rendered.  The jury rendered their verdicts in this case on March 2, 2017.  James did not file his motion for new trial until March 23, 2017.  Thus, his motion was untimely and failed to establish that he was unavoidably prevented from filing within the time set forth in the rules.  Moreover, the motion for new trial was based on alleged irregularities in the proceedings and a claim that there was insufficient evidence to support the jury's verdicts.  These were largely the same claims asserted in his appeal to this court.  As explained above, we find no merit to these arguments and cannot conclude the trial court abused its discretion by denying the motion for new trial.

{¶ 66}  Accordingly, we overrule James's ninth assignment of error.

## IV. Conclusion

{¶ 67}  For the foregoing reasons, we overrule James's nine assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN, P.J., and SADLER, J., concur.

---

[1] In his brief on appeal, James cites R.C. 2945.79 in support of his argument that his motion for new trial should have been granted. We note that R.C. 2945.79 has been superseded by Crim.R. 33 and will apply that rule in considering James's ninth assignment of error. *See State v. Reed*, 65 Ohio St.2d 117, 123 (1981), fn. 1 (noting that Crim.R. 33 superseded R.C. 2945.79); *State v. Lei*, 10th Dist. No. 05AP-288, 2006-Ohio-2608, ¶ 21, fn. 3.