[Cite as *State v. Robinson*, 2018-Ohio-1809.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 17AP-5 |
| v. | : | (C.P.C. No. 14CR-6486) |
| James Robinson, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on May 8, 2018

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief:** *Nemann Law Offices*, and *Adam Lee Nemann*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Defendant-appellant, James Robinson, appeals from a judgment of conviction entered by the Franklin County Court of Common Pleas pursuant to jury verdicts finding him guilty of eight counts of trafficking heroin in violation of R.C. 2925.03(A)(2). For the following reasons, we affirm.

**Factual and Procedural Background**

{¶ 2} On December 11, 2014, a Franklin County Grand Jury indicted Robinson with eight counts of trafficking in heroin in violation of R.C. 2925.03(A)(2), felonies of the second degree. The charges arose out of a criminal investigation of drug activity in the

south end of the Columbus area.  Robinson entered a not guilty plea and proceeded to a jury trial.

{¶ 3}   At the trial, Detective Whitacre testified that the city of Columbus, Division of Police, had received a citizen complaint from a group of individuals regarding drug activity in the south end of Columbus in the area of Groveport Road and State Route 104. After talking with informants, patrol officers and other detectives, it was determined that there were several individuals who were working together in this area to sell heroin, cocaine, pills, and marijuana.  Based on the information gathered, Detective Whitacre applied for and received authorization to wiretap the phone of Keith Pippins.  Eventually, the wiretap expanded to Jack Morris and three other individuals.

{¶ 4}   During the investigation, the police intercepted a total of 55 calls between Pippins and 589-xxxx.  In some of the calls, Pippins would tell the other person what drugs he had available, and the person would say what he wanted.  Other calls concerned the timing and location when the two would meet.  Detective Ehrenborg, who was assigned to listen to intercepted calls, testified that he immediately recognized Robinson's voice as the other person on the phone with Pippins in these calls.  Detective Ehrenborg stated that he had known Robinson approximately 18 years and met with him five to ten times during that period.  The detective had no doubt that it was Robinson talking with Pippins.

{¶ 5}   After one of the intercepted calls with 589-xxxx on February 8, 2014, a surveillance team was sent out to the location that Pippins had arranged to meet with the other person.  The surveillance team located Pippins' Range Rover and also a green Expedition.  The tag on the Expedition was registered to Robinson.  The surveillance team was sent out again following an intercepted call with 589-xxxx on February 17, 2014.  The videotape showed the green Expedition arriving at the location that Pippens had directed the other person to come to.  The driver got out the vehicle and entered the residence that had Pippins' Range Rover in the driveway.  Shortly thereafter, the driver reemerged from the house and drove away.  Detective Ehrenborg was shown the video at trial, and he identified Robinson as the person who drove the green Expedition, entered the residence, and left soon after.

{¶ 6}   Detective Whitacre testified that the investigation came to an end on March 7, 2014.   A search warrant executed at Pippins' residence resulted in approximately 180

grams of heroin and a cellphone being seized among other items. The cellphone's SIM card was analyzed and showed a contact entry identified as Jimmy with the number 589-xxxx.

{¶ 7} At the end of the state's case, Jack Morris testified that he was partners with Pippins. He also knew Robinson as they had grown up in the same neighborhood. Morris entered a plea agreement with the state which required him to testify as required by the state. He identified the voices on the intercepted calls as belonging to Robinson and Pippins. After the state rested, Robinson made a Crim.R. 29 motion for acquittal. The trial court denied it.

{¶ 8} The jury found Robinson guilty of all 8 counts of trafficking and also found that the amount of heroin involved was greater than or equal to 10 grams but less than 50 grams. The trial court sentenced Robinson to 2 years on each count and ordered that they be served consecutively for a total of 16 years.

**The Appeal**

{¶ 9} Robinson appeals his convictions and assigns the following assignments of error:

> [I.] THE STATE PRODUCED INSUFFICIENT EVIDENCE TO SUPPORT THE DEFENDANT'S CONVICTION.
>
> [II.] THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> [III.] THE EVIDENCE AGAINST MR. ROBINSON WAS INSUFFICIENT TO SUSTAIN A JURY VERDICT OF GUILTY.
>
> [IV.] THE TRIAL COURT ERRED BY PERMITTING THE STATE TO INTRODUCE "OTHER ACTS" EVIDENCE THAT WAS UNFAIRLY PREJUDICIAL TO THE DEFENDANT.

**Admission of "Other Acts" Testimony**

{¶ 10} In his fourth assignment of error, Robinson argues that the trial court erred in permitting testimony and evidence of drug trafficking that was seized during the execution of the search warrant at Pippins' residence. Robinson specifically contends that the search warrant affidavit (State's Ex. C), the evidence inventory (State's Ex. C-1), crime lab report (State's Ex. C-2), and photographs (State's Ex. C-3 through C-7) should not have been permitted. Because the search of Pippins' residence did not occur until March 7, he argues the evidence generated from that search was unrelated to the offenses that he was

charged with as the indictment and bill of particulars indicate his offenses occurred between February 6, 2104 and March 5, 2014.  According to Robinson, he was unfairly prejudiced by the admission of this evidence in violation of Evid.R. 403.

{¶ 11} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus; *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 22.  Accordingly, an appellate court should not interfere with a trial court's evidentiary rulings absent an abuse of discretion.  *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984), citing *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967).  "An abuse of discretion 'connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 181 (Resnick J., concurring in part and dissenting in part), quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).  " 'Abuse of discretion' has been described as including a ruling that lacks a 'sound reasoning process.' "  *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).  *See also State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, ¶ 23.

{¶ 12} Evid.R. 401 defines "[r]elevant" evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, all relevant evidence is admissible, and irrelevant evidence is inadmissible.  Evid.R. 402.  Evidence that is relevant, however, may be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."  Evid.R. 403(A).

{¶ 13} Detective Whitacre identified the search warrant and the inventory list at trial.  From those documents, he stated that the search warrant was for 3948 Grand Bend Drive and that the inventory listed items 27 and 28 as heroin.  He also indicated that a cellphone was recovered from the bedroom.  These documents, however, were never admitted into evidence.  The lab report (State's Ex. C-2) stated that items 27 and 28 were analyzed and determined to be heroin.  State's exhibit C-3 through C-7 were pictures taken at 3948 Grand Bend Drive.  They show the front of the house, the basement, a bench with

a scale on it, and two pictures of a bag of heroin. State's exhibit C-2 through C-7 were admitted into evidence.

{¶ 14} The state's case against Robinson mainly relied on the intercepted phone calls between Pippins and Robinson. The evidence from the March 7 search was used to prove that Pippins was capable of selling heroin and had it in the quantity discussed during the intercepted phone calls. This evidence was therefore relevant to prove that Robinson was getting heroin from Pippins and then reselling it. We also conclude that this evidence was not unfairly prejudicial to Robinson. During cross-examination of Detective Whitacre, it was made clear to the jury that the March 7 search warrant was not executed at Robinson's residence; that the heroin recovered did not belong to Robinson; and that Robinson was not charged with any offenses resulting from March 7, 2014. The jury was also informed that no controlled substances were found on Robinson's person.

{¶ 15} The fourth assignment of error is overruled.

**Sufficiency of the Evidence**

{¶ 16} In the first and third assignments of error, Robinson argues that the state failed to present sufficient evidence to survive a Crim.R. 29 motion for acquittal and to sustain his convictions. Because the same standard of review applies to sufficiency of the evidence and Crim.R. 29(A) motions for acquittal, we consider the first and third assignments of error together. *State v. Messer-Tomak*, 10th Dist. No. 07AP-720, 2008-Ohio-2285, ¶ 7-8.

{¶ 17} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law. *Id.* In determining whether the evidence is legally sufficient to support a conviction, an appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 18} In this case, Robinson was convicted of eight counts of trafficking in heroin in violation of R.C. 2925.03(A)(2) which provides that "[n]o person shall knowingly * * * [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a

controlled substance * * * when the offender knows or has reasonable cause to believe that the controlled substance * * * is intended for sale or resale by the offender or another person."

{¶ 19} Robinson argues that the state failed to present any direct evidence that he was in possession of heroin. No drugs were found on Robinson when he was arrested and his home and vehicle were never searched. Robinson also contends that there was no evidence presented that he prepared the drugs for sale or that he sold heroin. According to Robinson, the state's case is based on assumption and inference and is therefore insufficient to sustain his convictions.

{¶ 20} The state acknowledges that its case is based on circumstantial evidence but contends that it is sufficient to support the convictions. Circumstantial evidence is the " 'proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.' " *State v. Griesheimer*, 10th Dist. No. 05AP-1039, 2007-Ohio-837, ¶ 26 quoting *State v. Bentz*, 2 Ohio App.3d 352, 355, fn. 6 (1st Dist.1981). It has the same probative value as direct evidence. *Jenks* at 272. "[C]ircumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Heinish*, 50 Ohio St.3d 231, 238 (1990).

{¶ 21} The majority of the state's case against Robinson is the intercepted phone calls between Robinson and Pippins. On February 5, 2014, Robinson called Pippins at 11:06 a.m. and asked where Pippins was. After agreeing to meet at Thorntons, the following exchange occurred:

> Pippins:     You just want the weed?
>
> Robinson:    Yeah. Until you grab me a quarter of that soft. If you gonna do that for me. I can't fuck with the whole zip, man. That don't go that fast for me. If it went fast for me I could. You know.
>
> Pippins:     Right, right, right. That's cool. I've got some boy too, some boy.
>
> Robinson:    Right yeah. Next time I'll grab on them ones for eight or nine.
>
> Pippins:     They ain't bad. They ain't bad.

> Robinson: I get them for a stack from my other dude on front.
>
> Pippins: Yea.
>
> Robinson: I'm giving you cash money and I ain't getting no better of a deal.
>
> Pippins: I mean the dope better though. I mean.
>
> Robinson: They ain't telling me it's no better or worse. Know what I mean?
>
> Pippins: Uhhh. I mean (inaudible)
>
> Robinson: That's what I mean. The one time I grabbed that shit from you for the six for the fourteen it was definitely what they were expecting, but every time after that, it ain't been that.

(Transcript of audio file, State's Ex. E1.)

{¶ 22} The state presented evidence that "boy" means heroin and that "soft" is cocaine. A zip is an ounce. A half ounce of heroin could cost between $500 and $1,000 depending on the quality of the heroin. *Id.*

{¶ 23} The next day, Robinson called Pippins and referred to their conversation from the previous day stating "Uh, you said you got me one of them ones for nine." When Pippins agreed, Robinson told him that he would grab one and "some killer." The two spoke again an hour and a half later. Pippins told Robinson he didn't have any killer but he had the nine. They agreed to meet at "Paws." Robinson then called Pippins to say that he was about to arrive but that he counted his "dough" and realized he only had "7" on him. Pippins agreed to trust him for the rest. *Id.*

{¶ 24} On February 8, 2014, Pippins told Robinson that he had Kyle test some "shit" and that Robinson could ask Kyle what it was like. Pippins said that he would have to charge Robinson 12 for 25 grams. When Robinson resisted, Pippins told him it was "fire." Robinson wanted to know if he could get a half, and Pippins agreed. They arranged to meet in the "hood." *Id.* Robinson called Pippins and told him he had arrived at his aunt's house.

{¶ 25} The state presented testimony that "fire" meant high quality heroin. There was also testimony that although 1 ounce was 28 grams it could also be only 25 grams. The

meeting was also corroborated by the surveillance team when it identified Robinson's car in a driveway on Lock Avenue and Pippins' Range Rover at the next house.

{¶ 26} On February 17, 2014, Robinson and Pippins had the following exchange:

Robinson:     You got something new. You got some flame for me?

Pippins:      Yeah, this shit flame.

Robinson:     I need something that they going to be calling back man.

Pippins:      Yeah, hell yeah. This shit good.

*Id.*

{¶ 27} The remaining conversations that day involve Robinson and Pippins arranging their meeting location. Eventually, it was decided that Robinson would go to Grand Bend Drive and Pippins gave him directions. The surveillance team captured video of Robinson arriving at Grand Bend Drive, entering a house, exiting shortly thereafter, and driving away.

{¶ 28} On February 22, 2014, Robinson called Pippins and asked if he had some flame. Pippins told him, "Yup, new shit, dark dark shit, what you want?" Robinson replied, "Yes sir, as long as it's some super fire that's what I need." *Id.* They agreed on a price and that Robinson would get it the next day. Robinson called Pippins on February 23 and told him that he had just pulled up to Pippins' location.

{¶ 29} On February 28, 2014, Robinson called Pippins and said that he needed "a half of some flame," and "some undone, and some killer." The remaining calls that day involve the two updating the other of their location as they headed to "the hood." *Id.*

{¶ 30} On March 1, 2014, Robinson told Pippins he wanted the "same one from yesterday" and that "[t]hat was right again, they was happy. They was cool with that." *Id.*

{¶ 31} On March 3, 2014, Pippins asked Robinson, "[y]ou need another one?" After Robinson said that he did, Pippins said, "[t]hey love that shit, don't they?" Robinson replied, "[y]es sir." *Id.* A similar conversation occurred on March 5, 2014.

{¶ 32} Based upon our review of the evidence, especially when viewed in a light most favorable to the state, the evidence presented at trial was sufficient to support Robinson's convictions for trafficking in violation of R.C. 2925.03(A)(2). On eight different days, Robinson arranged to buy heroin from Pippins and set up meeting locations. In follow-up

conversations, Robinson would tell Pippins when he was about to pull up to the meeting site or had already arrived. Often, these meetings took place in the "hood." Testimony established that the "hood" was Lock Avenue where Morris, Morris' grandfather, and Robinson's aunt lived. Other meetings occurred on Grand Bend Drive where Pippins lived.

{¶ 33} There is also indication that Robinson intended to sell that heroin to others. Robinson was buying at least one-half an ounce (or 13 grams) per transaction. The state presented testimony that personal use of heroin was 0.2 grams. In one early conversation, Robinson relayed that people were unhappy with the quality of the heroin. In another, he indicated that he was out and had people calling him. Robinson also told Pippins that he wanted quality heroin so that people would call him for more. Finally, in March 2014, he told Pippins that they were "happy" and "cool" with the heroin and later agreed that they "loved that shit." *Id.* Although there may not be direct evidence that Robinson possessed the heroin, these statements are admissions by Robinson that he had received the heroin, transported it, and distributed it to others.

{¶ 34} The first and third assignments of error are overruled.

**Weight of the Evidence**

{¶ 35} In the second assignment of error, Robinson argues that his convictions are against the manifest weight of the evidence. The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *Thompkins*, 78 Ohio St.3d at 387. When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* at 387. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983); *State v. Strider-Williams*, 10th Dist. No. 10AP-334, 2010-Ohio-6179, ¶ 12.

{¶ 36} In addressing a manifest weight of the evidence argument, we are able to consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting our review, we are guided by the presumption that the jury, or the trial court in a bench trial, " 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, we afford great deference to the jury's determination of witness credibility. *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 55. *See also State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus (credibility determinations are primarily for the trier of fact).

{¶ 37} Robinson's argument that his convictions are against the manifest weight of the evidence is repetitive of his sufficiency argument. He points out that the state's evidence against him is derived from intercepted phone calls. He contends that there is no evidence of drug trafficking beyond conjecture and the inference that since he associated with people who trafficked drugs that Robinson must also be involved in trafficking. We disagree.

{¶ 38} Based on a review of the record, we find that the jury did not clearly lose its way so as to create a manifest injustice. The circumstantial evidence in this case was substantial. The phone conversations established that Robinson was more than just a buyer of heroin. He told Pippins that he had people calling him for drugs. He also said that he wanted good quality heroin so that people would call him for more. Further, Robinson relayed that people were happy with the new heroin and that they loved it. This is not a case in which the evidence weighs heavily against the convictions. Therefore, Robinson's convictions are not against the manifest weight of the evidence.

{¶ 39} The second assignment of error is overruled.

{¶ 40} For the foregoing reasons, Robinson's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

BROWN, P.J., and SADLER, J., concur.