[Cite as *State v. Hawkins*, 2021-Ohio-2899.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 19AP-546 |
| v. | : | (C.P.C. No. 17CR-6414) |
| Marzett Hawkins, III, | : | (REGULAR CALENDAR) |
| | : | |
| Defendant-Appellant. | : | |
| | : | |

D E C I S I O N

Rendered on August 24, 2021

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Seth L. Gilbert*, for appellee.

**On brief:** *Wolf Law Group, LLC,* and *Stephen T. Wolfe*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Defendant-appellant, Marzett Hawkins, III, appeals from the judgment entry of the Franklin County Court of Common Pleas, pursuant to a jury verdict, finding him guilty of aggravated murder, murder, felonious assault, and having a weapon under disability.

{¶ 2} For the reasons that follow, we affirm.

I. FACTS AND PROCEDURAL HISTORY

{¶ 3} On November 29, 2017, appellant was indicted on one count of aggravated murder in violation of R.C. 2903.01, an unclassified felony (Count 1); two counts of murder in violation of R.C. 2903.02, an unclassified felony (Counts 2 and 3); felonious assault in violation of R.C. 2903.11, a felony of the second degree (Count 4); and two counts of having weapons while under disability in violation of R.C. 2923.13, a felony of the third degree

(Counts 5 and 6). Counts 1 through 4 of the indictment all included a firearm specification in violation of R.C. 2941.145(A); firearm specification in violation of R.C. 2941.146(A); and criminal gang activity specification in violation of R.C. 2941.142(A). Appellant entered a not guilty plea and requested a jury trial.

{¶ 4} After the completion of voir dire, the jury was empaneled on June 11, 2019. The trial commenced on the first four counts of the indictment.[1] The charges originate out of two separate shootings that occurred on or about November 12, 2017. Appellee presented 18 witnesses as well as numerous exhibits including: photographs, surveillance and crime camera footage, social media posts, and jail call recordings. The following evidence was adduced at trial.

## A. Berkeley Road and Fulton Avenue Shooting

{¶ 5} On Sunday, November 12, 2017, shortly before 1:00 p.m., R.C. was shot in the hip while walking with his nephew near the intersection of Berkeley Road and Fulton Avenue. R.C. testified the shooter fired from a black vehicle displaying 30-day temporary tags. According to R.C., the individual yelled "Oh, is that [R.C.]?" and "Do you * * * want some too?" before discharging the firearm. (June 14, 2019 Tr. Vol. III at 291.) The shooter fled the scene in his vehicle driving toward Main Street. R.C. testified that the area is known for high gang activity and admitted he was a member of the Mound and Berkeley Bloods street gang. (Tr. Vol. III at 282-83.) R.C. acknowledged that there was a conflict with the Easthaven Bloods when Buda-bang, an Easthaven Blood member, was killed at a nightclub. (Tr. Vol. III at 286-87.)

{¶ 6} After the shooting, R.C. was transported by ambulance to Grant Medical Center. (Tr. Vol. III at 295.) At the hospital, R.C. was unable to identify the shooter but described the individual as a light-skinned African American male with a beard and glasses. (Tr. Vol. III at 292.) R.C. testified that a couple days after the shooting, he was shown a picture of appellant from Instagram. (Tr. Vol. III at 339.) R.C. stated that when he saw a picture of appellant, "I knew exactly who it was." (Tr. Vol. III at 300.) R.C. identified appellant in the courtroom as the individual that shot him on November 12, 2017.

---

[1] Appellant waived his right to a jury and requested a trial by the court on counts 5 and 6, having a weapon under disability in violation of R.C. 2923.13, felonies of the third degree. The parties agreed that evidence would be presented on these charges after the jury trial. (Tr. Vol. V at 897.)

{¶ 7}  E.Y. testified to living in the area of Berkeley and Sycamore on November 12, 2017.  According to E.Y., on the afternoon of November 12, 2017, he was driving to the carryout at Berkeley and Main Street when he saw an individual in a black vehicle shoot at two men walking down the sidewalk.  E.Y. testified that the shots came from the left side of the vehicle before it sped away toward Main Street.  (June 13, 2019 Tr. Vol. II at 104, 109.) "He didn't slow down a lick. He didn't hit his brake lights or nothing."  (Tr. Vol. II at 114.) E.Y. described the vehicle to law enforcement as a black car with 30-day temporary tags. On cross-examination, E.Y. stated that he did not know whether it was a male or female driver or whether multiple people were in the vehicle.  (Tr. Vol. II at 117-18.)

{¶ 8}  Officer Jacob Champer of the Columbus Police Department ("CPD") testified to interviewing R.C. at the hospital on November 12, 2017.  According to Champer, R.C. described the shooter as a light-skinned African American male that shouted R.C.'s name before discharging the firearm.  (Tr. Vol. II at 131.)  Champer recounted that R.C. indicated that the shooter fled driving northbound toward Main Street.

## B. 520 Lilley Avenue Shooting

{¶ 9}  On the evening of November 12, 2017, an individual shot and killed K.W. while the decedent was walking back from a corner store near 520 Lilley Avenue.

{¶ 10}  Officer Dianne Yandrich testified that she was dispatched to a shooting at 520 Lilley Avenue during her shift on November 12, 2017.  According to Yandrich, upon arriving at the scene she initiated CPR on K.W. before the medics arrived but the victim was unresponsive.  Yandrich testified that K.W. suffered gunshot wounds to his back, armpit, and his right side.  (Tr. Vol. II at 264-65.)  Yandrich proceeded to work with the other officers to secure the scene.  (Tr. Vol. II at 261-62.)  A security camera was recovered from the building located at 530 Lilley Avenue.

{¶ 11}  Detective Lisa Swisher of the Crime Scene Search Unit testified that she was dispatched to a homicide at 420 Lilley Avenue on November 12, 2017.  (Tr. Vol. II at 145.) Swisher testified as to taking photographs of the victim on the sidewalk, collecting evidence, and preparing a crime scene sketch.  Notably, two shell casings and a live bullet were collected near the victim.  (Tr. Vol. II at 155, 157-58.)  Swisher stated that she collected these items and secured them in the property room.  (Tr. Vol. II at 163-64.)

## C.  Investigation and Arrest

{¶ 12}  The parties stipulated that law enforcement located security footage from 530 Lilley Avenue from the date and time of the incident.  The parties also stipulated that on November 17, 2017, law enforcement was informed that appellant had recently purchased a black Hyundai with temporary tags, F277813.  (Tr. Vol. II at 197.)  On November 20, 2017, law enforcement obtained a search warrant for Motorola and Verizon cell phones that were believed to have been the property of appellant.  (Tr. Vol. II at 198.)  Law enforcement later obtained the purchase agreement and accompanying documentation for the Hyundai Elantra.  *Id.*

{¶ 13} A.C. testified she lived in the area of Lilley Avenue, Fulton Street, and Berkeley Road in 2017.  A.C. stated that she was familiar with the Mound and Berkeley Bloods and was aware they had problems with other gangs at that time.  (Tr. Vol. II at 200-01.)  According to A.C., on or around noon on November 12, 2017, she was sitting on the porch on Lilley Avenue when a dark vehicle approached and asked if she was "from Mound and Berk," which she denied.  (Tr. Vol. II at 204.)  A.C. described the driver as a bald, light-skinned African American male, with glasses and a beard.  A.C. testified that a few minutes after this interaction she heard "[s]hots."  (Tr. Vol. II at 206.)

{¶ 14}  A.C. further testified that during the evening of November 12, 2017, she went outside to collect some money after someone "ran off with $5.00." (Tr. Vol. II at 209.)  According to A.C., she was walking on Lilley and Mound when she saw "the same car from earlier that day" pull up and shoot from the driver's window at an individual walking across the street with a bag.  (Tr. Vol. II at 210.)  A.C. saw sparks coming from the driver's window and heard six or seven shots.  (Tr. Vol. II at 211-12.)  A.C. stated she was unable to see into the car or how many people were in the vehicle.  (Tr. Vol. II at 239.)  A.C. confirmed that the vehicle in the surveillance video was the same one that pulled up to the front of her home that afternoon, and appellant was the same individual that spoke to her earlier in the day.  (Tr. Vol. II at 251.)  A.C. testified that she was interviewed by law enforcement and identified appellant in a photo array on November 21, 2017.  (Tr. Vol. II at 223, 252.)  A.C. identified appellant in the courtroom as the driver of the dark vehicle on November 12, 2017.  (Tr. Vol. II at 226.)

{¶ 15}  SWAT Sergeant Joseph Podolski testified that he was provided appellant's cell phone number and information about the purchase of a black Hyundai.  Podolski stated

that a court order was obtained to "ping" the number in order to locate appellant. (Tr. Vol. III at 356.) According to Podolski, when CPD checked the location of the phone, they determined the black Hyundai Elantra was parked at the rear entrance of 1444 Forest St. Apt. D., but the vehicle did not have temporary tags. Podolski stated that the license plates displayed on the vehicle were registered to appellant's aunt, Abony Clark. SWAT surveilled the area and knocked on the apartment door. Appellant was located inside the apartment and arrested.

{¶ 16} Podolski stated that after appellant was taken into custody, CPD discovered shell casings lodged in the front of the vehicle. Podolski testified "this one was unusual in the fact that it had shell casings that had been caught near the wiper blades there between the windshield and the hood of the vehicle." (Tr. Vol. III at 362.) Podolski identified photographs of the vehicle, license plate, apartment, and shell casings. Podolski testified that the Hyundai Elantra was held until the crime scene search unit came out to process and impound the vehicle. Detective Donald Jones of the Crime Scene Search Unit also testified to taking photographs of the 1444 Forest St., Apt. D location, the vehicle, and casings found on the cowl panel of the Hyundai. Jones stated that appellant's brown wallet and cell phone were discovered in the home, which were secured in the CPD property room. (Tr. Vol. III at 472.)

{¶ 17} Detective Thomas Burton of the Crime Scene Search Unit testified as to the processing and search of appellant's vehicle. Burton stated that appellant's vehicle was impounded on November 19, 2017. Burton identified a series of 30 photographs taken of appellant's vehicle. (Tr. Vol. III at 376-80.) According to Burton, a temporary license tag and clothing were discovered in the trunk of the vehicle. Burton also testified that appellant's social security card and traffic ticket were found in the glove compartment. (Tr. Vol. III at 382.)

{¶ 18} C.W. testified that she lived with K.W. and her daughter at 528 Lilley Avenue in 2017. C.W. stated that K.W. was from Indianapolis and was not in a gang. According to C.W., on the evening of November 12, 2017, the decedent left the residence to get food at M & R market for dinner. (Tr. Vol. III at 403.) C.W. heard several shots from the street and left the apartment. C.W. stated that law enforcement walked her back home and away from the crime scene. (Tr. Vol. III at 419.) C.W. identified K.W. on the security video leaving their residence and walking towards the market. (Tr. Vol. III at 413-14.)

{¶ 19} Richard Clark, the Site Administrator and Technician for Golf Tango Lane ("GTL") at Franklin County Corrections Center, testified as to how the inmate telephone system is maintained. According to Clark, inmates are given a unique identification number or PIN number, but inmates sometimes trade or use other PINs. Clark stated each call is recorded and every phone call tells the user that he or she is being recorded. (Tr. Vol. II at 170, 174, 184.) Clark testified as to retrieving calls made by appellant and that the recordings are kept in the normal course of business. (Tr. Vol. II at 186.)

{¶ 20} Jeffrey Brenner of the Ohio Organized Crime Investigation Commission was identified as an expert in the field of audio/visual forensics. Brenner stated that he received a copy of the security video that was hand-delivered by Detective Arthur Hughes on January 2, 2018. Brenner reviewed the video and determined it was unaltered. Brenner testified that the video showed brake lights and muzzle flash emanating from the driver's side of the vehicle. (Tr. Vol. III at 496-97.)

{¶ 21} On cross-examination, Brenner acknowledged that he could not determine who was driving the car or if anyone else was inside the vehicle. Brenner also conceded that he was not able to get the license plate through the video or determine if the muzzle flash came from the front or back seat on the driver's side of the vehicle. (Tr. Vol. III at 504-06.)

{¶ 22} P.L. testified that he worked with appellant at Condado Tacos in November 2017. (June 17, 2019 Tr. Vol. IV at 517.) According to P.L., law enforcement contacted him regarding the whereabouts of appellant on November 12, 2017. P.L. testified as to payroll procedure for Condado Tacos and that appellant's timecard for the date in question showed he arrived for work at 4:05 p.m. and left at 7:43 p.m. (Tr. Vol. IV at 525.)

{¶ 23} Brian Johnson of the CPD Homicide Crime Laboratory, an expert in the field of firearms, testified as to the firearms and casings in this case. Johnson stated that he will generally "receive a lab request with an evidence item so usually it's a firearm. It can also be the cartridge case, or cartridge cases, and bullets. I will be asked to test the operability or the functionality of a weapon that's recovered; and, periodically, I'm asked to associate cartridge cases to each other or to a weapon or bullets to each other or to a weapon." (Tr. Vol. IV at 536.) Johnson examined four shell casings to determine if they were fired from the same weapon. Johnson described the process of comparing shell casings and ultimately concluded the casings were fired from the same weapon. Johnson also testified that a

firearm shot from the driver's side of a vehicle in that direction could eject casings on the window and land in the windshield area. (Tr. Vol. IV at 569.)

{¶ 24} Amber Gill, a Criminal Intelligence Analyst for CPD, testified as to records obtained from Facebook and the Bureau of Motor Vehicles ("BMV"). Gill stated that she assisted in the investigation looking into appellant's social media account and aided in filing CPD's request for records with Facebook. Gill testified to screen shots of appellant's Facebook post on November 15, 2017 that stated: "People showing they true colors everyday, but check digg I'm on some straight homicide shit so keep that fake love from round me." (Tr. Vol. IV at 603.) According to Gill, the post was later deleted from Facebook and there was no indication the account was hacked. (Tr. Vol. IV at 606.)

{¶ 25} Gill also testified that she obtained information from the BMV regarding the temporary tags on appellant's vehicle. According to Gill, appellant completed a power of attorney form and the BMV temporary tag registration application for the vehicle. Gill noted the signature at the bottom of the document indicated appellant's name and was dated September 15, 2017. (Tr. Vol. IV at 609.)

{¶ 26} Detective James Howe of the CPD Digital Forensics Unit, an expert in the fields of digital forensics and cell site analysis, testified regarding the processing of appellant's cell phones. Howe testified as to the general location of appellant's phone before and after the shootings. Howe concluded that appellant made no cell phone calls between 7:51 p.m. and 8:15 p.m. Howe testified that appellant did send outgoing messages on November 16, 2017 stating, "I'm one of Lucifer's death angels" and "We all have a debt to pay." (Tr. Vol. IV at 714.)

{¶ 27} Detective Arthur Hughes of CPD testified regarding several aspects of the investigation into the homicide of K.W. Hughes testified the November 12, 2017 video indicated that K.W. left his residence and was shot from the vehicle as evidenced by the muzzle flash emanating from the driver's side of the car. (June 18, 2019 Tr. Vol. V at 766.) Hughes described the nature of K.W.'s injuries as two gunshot wounds to the right upper back area and one gunshot wound to the right side of the torso. (Tr. Vol. V at 765.) According to Hughes, casings were recovered from the street and on appellant's vehicle. Hughes stated that it was later concluded the casings had come from the same weapon. (Tr. Vol. V at 767.)

{¶ 28} Hughes stated that he prepared a photo array for A.C. but that a blind administrator presented the photo array to the witness. (Tr. Vol. V at 794.) A.C. was able to identify appellant in position number five as the individual that shouted to her, "Y'all from Berk" from his vehicle. (Tr. Vol. V at 795.) According to Hughes, the video of the vehicle going up 530 Lilley was consistent with A.C.'s timeline of events. (Tr. Vol. V at 825.) Hughes testified that, based on his investigation and experience, he is aware of problems between the Easthaven Bloods and the Mound and Berkeley Bloods which escalated after the killing of Buda-bang. (Tr. Vol. V at 828.)

{¶ 29} Regarding appellant's jail calls, Hughes testified appellant made several incriminating statements including that appellant had to "figure out who * * * used the car" and asking D.C. to "deactivate" and "scrub" his phone and Facebook pages for anything incriminating. (Tr. Vol. V at 858-61.) On cross-examination, Hughes conceded that he could not tell from the video who was driving the vehicle or how many people were in the car. (Tr. Vol. V at 904.)

{¶ 30} Officer Anthony Johnson, formerly a detective with the Criminal Information Unit, or Gang Unit, from 2008-2015, was recognized as an expert in the field of identification of criminal street gangs. Johnson testified that certain criterion must be met to be a documented gang member such as association or committing criminal activity with other known gang members, tattoos or branding, self-admission, and reliable information from an informant. (Tr. Vol. V at 946-48.) According to Johnson, the Easthaven Bloods have documented gang activity since 2004 with approximately 38 documented members. (Tr. Vol. V at 950.) Johnson described the impetus of the dispute between the Easthaven Bloods and the Mound and Berkeley Bloods: "It was a rap concert. At some point, they left the concert. There was a couple shootings, and it turned into a bunch of Easthaven guys and MOB guys shooting back and forth at each other. They had one killed * * *. It was very -- very volleyed, multiple gun shots, multiple guns being shot inside the club there." (Tr. Vol. V at 953.)

{¶ 31} According to Johnson, appellant has been a documented member of the Easthaven Bloods since 2008. Johnson testified appellant admitted being an active member of the Easthaven Bloods in 2015. (Tr. Vol. V at 1000.) Johnson also stated appellant has gang tattoos and had a known affiliation with another member with a gun, in a vehicle, in April 2016. (Tr. Vol. V at 955.) Johnson also testified as to appellant's recorded

statements threatening a Mound and Berkeley Blood member, different gang member interactions, and revenge for Buda-bang's death. Appellant stated "Nobody dropped. As soon as I get involved in it -- as soon as I get involved in it, you seen what happened. You seen -- once I get to calling the shots, you seen what happened, man." (Tr. Vol. V at 992.) Based on these factors, Johnson concluded that appellant was an active gang member and R.C. was in a rival gang in November 2017.

{¶ 32} At the close of appellee's case, appellant moved for judgment of acquittal pursuant to Crim.R. 29, which the trial court denied. (Tr. Vol. V at 1076.) Appellant then called R.P. to testify. R.P. stated that she had a relationship with appellant in 2017, which ended later that year. (June 19, 2019 Tr. Vol. VI at 1095.) R.P. acknowledged she initially told law enforcement that appellant admitted to her that he killed K.W. but denied shooting R.C. According to R.P., she lied during the interview with law enforcement because she was angry with appellant. "I wanted him hurt. We was -- I hated him. We were on very bad terms." (Tr. Vol. VI at 1121.) R.P. conceded that she had previously told law enforcement that on November 12, 2017, appellant called her at 9:03 p.m. and that she provided appellant's phone number to law enforcement. On the night in question, R.P. testified that she watched appellant go to his other girlfriend's apartment around 7:45 p.m. and stay until approximately 9:22 p.m. R.P. denied speaking with appellant regarding the trial but admitted to visiting appellant in jail over 23 times. After the close of his case, appellant renewed his previous Crim.R. 29 motion, which was denied by the trial court.

## D. Complicity Instruction

{¶ 33} At the end of the trial, the parties addressed the use of a complicity instruction for the jury. After much discussion, the trial court determined that appellee presented enough facts that appellant could have aided, abetted, or participated in the offenses with one or more persons warranting a complicity instruction. "So if his car was there and the jury believes that he was there, that there were other people in the car, then I think that complicity would be appropriate. * * * And because there might be other people in that car and we don't have anybody saying he was the shooter then I think it's appropriate for them to consider that even if he wasn't the shooter but that he was in that car complicity does apply." (Tr. Vol. VI at 1317-18.) The trial court also noted that given the nature of gang related offenses and appellant's statements during the jail calls there was enough

evidence that the jury could find that more than one person was in the vehicle at the time of the offenses.

## E. Jury Verdict and Sentencing

{¶ 34} On June 20, 2019, the jury returned verdicts finding appellant guilty of all counts and specifications. The trial court ordered a presentence investigation and set the matter for a sentencing hearing. On August 1, 2019, appellant entered a guilty plea to one count of having a weapon under disability. The second count was dismissed nolle prosequi. The trial court found that Counts 1, 2, and 3 of the indictment merged, and sentenced appellant to life without the possibility of parole on the aggravated murder conviction. The trial court also imposed a combined term of 28 years in prison for appellant's convictions of felonious assault, having a weapon while under disability, and the specifications. The sentence was to be served consecutively to the life sentence. Appellant was given 623 days of jail-time credit.

{¶ 35} Appellant filed a timely appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 36} Appellant assigns the following as trial court error:

> [1.] The verdicts were not supported by sufficient evidence and Appellant's Crim.R. 29 Motion should have been granted.
>
> [2.] The jury's verdicts were against the manifest weight of the evidence.
>
> [3.] The trial court erred when it gave the jury a complicity instruction.
>
> [4.] The trial court erred when it allowed the State to reopen direct questioning of a witness.

## III. LEGAL ANALYSIS

### A. Appellant's First Assignment of Error

{¶ 37} In his first assignment of error, appellant argues there was insufficient evidence to support the verdict and appellant's Crim.R. 29 motion should have been granted. Specifically, appellant contends that insufficient evidence was provided to identify appellant as the shooter in either incident. We disagree.

{¶ 38} Pursuant to Crim.R. 29(A), "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment

of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." Sufficiency of the evidence is a legal standard that tests whether the evidence at trial is legally adequate to support the verdict. *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 15, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "Whether the evidence is legally sufficient to support a verdict is a question of law, not fact." *State v. Cervantes*, 10th Dist. No. 18AP-505, 2019-Ohio-1373, ¶ 24, citing *Kurtz* at ¶ 15, citing *Thompkins* at 386. When resolving whether the evidence is legally sufficient, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307 (1979).

{¶ 39} In a sufficiency of the evidence analysis, "appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction." *Kurtz* at ¶ 16, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80. As a Crim.R. 29 motion concerns the sufficiency of the evidence, we apply the same standard of review as in a challenge to the sufficiency of the evidence. *State v. Guy*, 10th Dist. No. 17AP-322, 2018-Ohio-4836, ¶ 40, citing *State v. Kearns*, 10th Dist. No. 15AP-244, 2016-Ohio-5941, ¶ 44.

{¶ 40} R.C. 2903.01 defines aggravated murder in relevant part, as "[n]o person shall purposely, and with prior calculation and design, cause the death of another." "[T]here is 'no bright-line test that emphatically distinguishes between the presence or absence of "prior calculation and design." Instead, each case turns on the particular facts and evidence presented at trial.' " *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, ¶ 19, quoting *State v. Taylor*, 78 Ohio St.3d 15, 20 (1997). R.C. 2903.11(A) defines felonious assault as "[n]o person shall knowingly do either of the following: (1) Cause serious physical harm to another * * * (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶ 41} After careful review of the evidence in a light most favorable to appellee, any rational trier of fact could have found sufficient evidence was presented identifying appellant as the shooter in both incidents.

{¶ 42} Ohio courts have repeatedly found that identification can be demonstrated through direct or circumstantial evidence. *See, e.g.*, *State v. Brown*, 10th Dist. No. 07AP-244, 2007-Ohio-6542, ¶ 19. Direct evidence exists when a witness testifies to information " 'within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish.' " *Fabal* at ¶ 26, quoting *State v. Cassano*, 8th Dist. No. 97228, 2012-Ohio-4047, ¶ 13.

{¶ 43} Conversely, "[c]ircumstantial evidence is the ' "proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind." ' " *State v. Robinson*, 10th Dist. No. 17AP-5, 2018-Ohio-1809, ¶ 20, quoting *State v. Griesheimer*, 10th Dist. No. 05AP-1039, 2007-Ohio-837, ¶ 26, quoting *State v. Bentz*, 2 Ohio App.3d 352, 355 (1st Dist.1981), fn. 6. A criminal conviction may be based entirely, or in part, on circumstantial evidence. *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988). Circumstantial evidence has the same probative value as direct evidence. *Robinson* at ¶ 20, citing *Jenks* at 272; *see also State v. Williams*, 10th Dist. No. 03AP-4, 2003-Ohio-7160 ("A jury can convict on circumstantial evidence alone."). Circumstantial evidence does not have to exclude "every reasonable hypotheses except that of guilt." *Id.* at ¶ 34, citing *State v. Lott*, 51 Ohio St.3d 160 (1990); *see also Williams* at ¶ 34, quoting *Lott* at 168 (" 'While inferences cannot be built on inferences, several conclusions can be drawn from the same set of facts; and a series of facts and circumstances can be used as a basis for ultimate findings.' ").

{¶ 44} In the present case, R.C. testified that appellant shot him on November 12, 2017. R.C. initially described the shooter to law enforcement as a light-skinned African American male with a beard and glasses. (Tr. Vol. III at 292.) According to R.C., the individual yelled "Oh, is that [R.C.]?" and "Do you * * * want some too?" before shooting and fleeing toward Main St. (Tr. Vol. III at 291.) While R.C. originally could not identify the shooter, R.C. testified that after seeing a series of photographs on Instagram, "I knew exactly who it was." (Tr. Vol. III at 300.) R.C. identified appellant in the courtroom as the individual that shot him on November 12, 2017. Ohio courts have held that the testimony of a sole witness, if believed, is sufficient to support a conviction. *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42. In a sufficiency of the evidence analysis, "[t]he court essentially assumes that state's witnesses testified truthfully and determines whether that testimony satisfies each element of the crime." *State v. Davis*, 10th Dist. No. 18AP-921,

2019-Ohio-4692, ¶ 38, citing *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4. Here, under the presumption that the witnesses' testimony is truthful, appellee has presented sufficient evidence that identifies appellant as the shooter of R.C. on November 12, 2017.

{¶ 45} Moreover, there is substantial circumstantial evidence that established appellant as the person who shot R.C. First, A.C. testified that on November 12, 2017, appellant was driving a dark vehicle with temporary tags and asked her if "Y'all from Berk." (Tr. Vol. V at 795.) A.C. stated that soon after appellant drove away she heard "[s]hots." (Tr. Vol. II at 206.) E.Y. testified that an individual in a black vehicle shot at two individuals walking down the sidewalk. E.Y. described the vehicle to law enforcement as a black car with 30-day temporary tags. "He didn't slow down a lick. He didn't hit his brake lights or nothing." (Tr. Vol. II at 114.) While E.Y. was unable to see into the vehicle, his description matched A.C.'s account. Similarly, R.C. testified that the shooter was driving a black vehicle displaying 30-day temporary tags.

{¶ 46} Regarding the shooting of K.W., A.C. testified to witnessing an individual shoot K.W. from the same dark vehicle she saw earlier that day. The surveillance video confirms the shooter fired at K.W. from a black vehicle. The cell phone records indicate appellant's general location before and after the shootings, which establish his proximity to both shootings. Moreover, the records from Condado Tacos indicate that appellant was not at work during either incident.

{¶ 47} There is also meaningful evidence that appellant's vehicle was used in the commission of both shootings. Appellee presented substantial evidence regarding appellant's ownership of the black Hyundai, the purchase of the vehicle, and the temporary tags discovered in the trunk. Appellant's use of the vehicle is also evident from the BMV documentation and traffic tickets recovered in the glove compartment. Moreover, the two casings found at the crime scene of K.W. matched the two casings found lodged in the hood of appellant's vehicle. (Tr. Vol. IV at 560-65.) Taking all this evidence into account, as well as appellant's own social media posts, text messages, and statements during the jail calls, there is substantial evidence connecting appellant to these shootings. Appellee need only present sufficient evidence, not the best possible evidence, to survive a challenge on insufficient evidence grounds. *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 166, citing *State v. Dye*, 9th Dist. No. 17763 (Mar. 12, 1997).

{¶ 48} Based on the foregoing evidence and reviewing the evidence presented in a light most favorable to appellee, a reasonable trier of fact could have found, beyond a reasonable doubt, sufficient evidence to support the elements of the crimes for which appellant was convicted.

{¶ 49} Appellant's first assignment of error is overruled.

**B. Appellant's Second Assignment of Error**

{¶ 50} In his second assignment of error, appellant argues that the jury's verdict was against the manifest weight of the evidence. Appellant's manifest weight challenge primarily contends that the jury lost its way because the testimony of R.C. contained inconsistences and the jury did not find R.P.'s testimony as credible. We disagree.

{¶ 51} While there can be sufficient evidence to support a verdict, an appellate court may nevertheless conclude that a judgment is against the manifest weight of the evidence. *State v. McCombs*, 10th Dist. No. 15AP-245, 2015-Ohio-3848, ¶ 3, citing *Thompkins,* 78 Ohio St.3d at 387. "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25, citing *Thompkins* at 386.

{¶ 52} When reviewing a manifest weight challenge this court "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for the most "exceptional case in which the evidence weighs heavily against the conviction." (Internal quotations omitted.) *Cervantes*, 2019-Ohio-1373, at ¶ 27.

{¶ 53} Having reviewed the evidence and trial transcript, we are convinced the jury did not clearly lose its way finding appellant guilty on all counts. Preliminarily, as set forth more extensively in the first assignment of error, there was substantial evidence, outside R.C.'s testimony, to support the conviction. Moreover, it is well-established law that a

conviction is not against the manifest weight because the jury believed appellee's account of events over the appellant's version of events. *State v. Morris*, 10th Dist. No. 18AP-208, 2018-Ohio-5252, ¶ 51, citing *State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 43, citing *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19. Here, the trier of fact believed appellee's version of the events on November 12, 2017, not appellant's version. As R.P. changed her story from telling law enforcement that appellant confessed to shooting K.W. to later testifying at trial that appellant was with his other girlfriend, the jury did not clearly lose its way by not finding her testimony credible. Conversely, while R.C. initially could not identify appellant as the shooter, he did provide a description of the shooter that matched other witness statements. Once R.C. was shown a picture of appellant, he testified that "I knew exactly who it was." (Tr. Vol. III at 300.) The jury was best positioned to observe the demeanor of the witnesses, and weigh the evidence offered at trial. *State v. Taylor*, 10th Dist. No. 14AP-254, 2015-Ohio-2490, ¶ 37. Such a determination is given great deference by a reviewing court. *Id.* Accordingly, we find appellant's convictions are not against the manifest weight of the evidence.

{¶ 54} Appellant's second assignment of error is overruled.

**C. Appellant's Third Assignment of Error**

{¶ 55} In his third assignment of error, appellant contends the trial court erred by providing a complicity instruction to the jury.

{¶ 56} Generally, the trial court's decision to provide or refuse a particular instruction is reviewed under an abuse of discretion analysis. *State v. McDonald-Glasco*, 10th Dist. No. 17AP-368, 2018-Ohio-1918, ¶ 29, citing *State v. Lipkins*, 10th Dist. No. 16AP-616, 2017-Ohio-4085, ¶ 28. An abuse of discretion connotes that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 57} A jury instruction must provide a correct and pertinent statement of the law that is relevant to the facts of the case. *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 46. "[I]n reviewing a record to determine whether there is sufficient evidence to support the giving of an instruction, 'an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction.' " *McDonald-Glasco* at ¶ 30, quoting *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991); *Feterle v. Huettner*, 28 Ohio St.2d 54 (1971). The trial court will not

provide a jury instruction where there is no evidence to support an issue. *Murphy* at 591, citing *Riley v. Cincinnati*, 46 Ohio St.2d 287 (1976).

{¶ 58}  It is well-settled law that while an appellant may be charged in the indictment as the principal offender, the trial court may provide an instruction to the jury on complicity when the evidence at trial reasonably supports that the appellant was an aider or abettor. *State v. Horton*, 10th Dist. No. 13AP-855, 2014-Ohio-2785, ¶ 8, quoting *State v. Herring*, 94 Ohio St.3d 246, 251, 2002-Ohio-796 ("Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is 'stated * * * in terms of the principal offense' and does not mention complicity."); *see also State v. Platt*, 10th Dist. No. 03AP-1148, 2005-Ohio-705, ¶ 19, citing *State v. Ratkovich*, 7th Dist. No. 02-JE-16, 2003-Ohio-7286, ¶ 10.    This court has repeatedly concluded that the instruction " 'mere presence can be enough if it is intended to and does aid the primary offender' " is an accurate statement of the law on complicity that effectively informs the jury that more than mere presence is required to render one an aider and abettor. *State v. Word*, 10th Dist. No. 17AP-367, 2019-Ohio-1733, ¶ 33, quoting *McDonald-Glasco* at ¶ 31-34; *State v. Williams*, 10th Dist. No. 15AP-48, 2016-Ohio-4550, ¶ 77-81

{¶ 59}  In the instant case, the jury was instructed, in relevant part, as follows:

> The defendant may be convicted as a principal offender or as a complicator or an aider and abettor to any or all Counts and the Firearm and Drive-By Specifications of the indictment. Complicity applies to the Firearm Specification as Defendant does not have to physically possess the weapon to be found guilty of the firearm specification. The Counts, the Firearm and Drive-By Specifications will be defined for you.

> Before you can find the defendant guilty of a crime or specification as a complicator or aider and abettor, you must find beyond a reasonable doubt that on or about 12th Day of November 2017 in Franklin County, Ohio, the defendant solicited or procured another to commit the offense or aided or abetted another in committing the offense with the same knowledge or purpose as required by the offense under consideration.

> The defendant cannot be found guilty of complicity unless the offense was actually committed, but he may be found guilty of complicity in an attempt to commit the offense.

An indictment charging a defendant as a principal offender also charges the defendant with aiding and abetting that crime. An aider or abettor is one who aids, assists, encourages, cooperates with advises, or incites another to commit a crime, and participates in the commission of the offense by some act, word or gesture.

"Aid" means to help, assist, or strengthen. "Abet" means to encourage, counsel, incite, or assist.

A common purpose among two or more people to commit a crime need not be shown by positive evidence, but may be inferred from circumstances surrounding the act and from defendant's subsequent conduct. Criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed. In addition, mere presence can be enough if it is intended to and does aid the primary offender.

 (June 24, 2019 Jury Instructions at 6-7.)

{¶ 60} After a careful review of the evidence, we conclude that the trial court's inclusion of a complicity instruction was not an abuse of discretion. Although appellant contends that appellee argued throughout the case that appellant was the shooter in both incidents, there were several factors that warranted the inclusion of the complicity instruction. First, appellant's primary defense throughout the trial was to cast doubt on the shooter's identity as well as whether another black vehicle could have been used in either incident. Appellant asked multiple witnesses whether they could identify the shooter or whether multiple people could have been in the vehicle during the shootings. This could lead a juror to potentially conclude that while appellant might not have fired the weapon, he was in the vehicle or involved in aiding the principal offender. Furthermore, appellant's statement during the jail call also provides some support for a complicity instruction as appellant stated he had to "figure out * * * who used the car." (Tr. Vol. V at 863.) This evidence, in conjunction with the social media posts and text messages, provide a reasonable basis for the trial court's inclusion of a complicity instruction.

{¶ 61} Appellant argues that the instruction was not warranted because appellee's theory of the case was that appellant was the sole shooter as evidenced by the language of the indictment. However, a defendant charged with an offense may be convicted of that

offense upon evidence that he was complicit in the commission of that crime regardless of whether the indictment against him or her is stated in terms of the principal offense. *Guy*, 2018-Ohio-4836, at ¶ 43, citing *Horton*, 2014-Ohio-2785, at ¶ 8.

{¶ 62} Finally, appellant argues that the evidence to support the complicity instruction was based on appellee's closing argument. This argument is also without merit. The trial court provided a detailed recitation of its reasoning for including the instruction based on evidence presented during the trial unrelated to any remarks by appellee during closing arguments. (Tr. Vol. VI at 1309-19.)

{¶ 63} Based on the trial court's analysis and review of the transcript, we find the trial court did not abuse its discretion by providing the jury the complicity instruction as it was an accurate portal of the law and supported by the evidence.

{¶ 64} As such, we overrule appellant's third assignment of error.

### D. Appellant's Fourth Assignment of Error

{¶ 65} In appellant's fourth assignment of error, appellant alleges that the trial court erred in allowing appellee to reopen direct questioning of a witness, Amber Gill. Again, we disagree.

{¶ 66} As set forth in R.C. 2945.10, the trial court controls all the proceedings during a criminal trial and may deviate from the order of proceedings within its discretion. *State v. Jenkins*, 15 Ohio St.3d 164 (1984), paragraph 11 of the syllabus, citing *State v. Bayless*, 48 Ohio St.2d 73 (1976), paragraph three of the syllabus; R.C. 2945.03. Any claimed error in the following of the statutorily mandated order of proceedings is a heavy burden to demonstrate the unfairness and prejudice from that deviation. *Id.*

{¶ 67} While we generally review the trial court's decision to reopen questioning of a witness under the abuse of discretion analysis, appellant failed to object to reopening the questioning of the witness at trial. *State v. Hunt*, 10th Dist. No. 12AP-1037, 2013-Ohio-5326, ¶ 80, citing *Columbus v. Grant*, 1 Ohio App.3d 96, 97 (10th Dist.1981), syllabus. As such, we will review this matter under a plain error standard. Plain error is to be taken with the utmost caution, under rare circumstances, and only to avoid a manifest miscarriage of justice. *State v. Hammonds*, 10th Dist. No. 06AP-1122, 2007-Ohio-4456, ¶ 8. To meet the plain error standard: (1) there must be an error, (2) the error must amount to an obvious defect in the proceedings, and (3) the error must have infringed upon appellant's

substantial rights by affecting the outcome of the proceeding. *Id.*, citing *State v. Barnes*, 94 Ohio St.3d 21, 27-28 (2002).

{¶ 68} In the case sub judice, we cannot find plain error. First, appellant had stipulated that the Facebook messages were properly acquired and did not contest that the Facebook records were inadmissible based on a lack of foundation. Appellant objected to the admission of the Facebook records largely on hearsay grounds. While Gill's testimony was potentially incomplete to authenticate the Facebook posts, the trial court's decision to deviate from the order of proceedings was not unreasonable as it appeared intended to clarify the testimony and prevent any subsequent evidentiary disputes. Moreover, appellant was given a full opportunity to cross-examine the witness concerning all aspects of her testimony mitigating any potential prejudice to the appellant's case.

{¶ 69} Even if we were to find that the trial court erred by reopening Gill's testimony, the error was not outcome determinative and did not affect appellant's substantial rights. It is well-established law that the error must substantially affect the outcome of the trial. *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, ¶ 67. The alleged error must have substantially affected the outcome of the case such that " 'but for the error, the outcome of the trial clearly would have been otherwise.' " *Id.*, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus. Here, appellee presented considerable evidence throughout the trial as to appellant's guilt as to the shooting of R.C. and K.W. This evidence includes: witness statements and identification, the matching casings at the scene of the homicide and in appellant's vehicle, jail calls, discovery of the temporary license plate, and appellant's own statements. Based on our review of the record, we conclude that appellant failed to demonstrate the trial court committed plain error by allowing appellee to reopen questioning of the witness.

{¶ 70} For the foregoing reasons, appellant's fourth assignment of error is overruled.

## IV. CONCLUSION

{¶ 71} Having overruled appellant's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and LUPER SCHUSTER, JJ., concur.

_____